# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **KATHLEEN I. IRWIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:07-CV-187** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Kathleen I. Irwin appeals to the District Court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the reasons set forth herein, the Commissioner's decision will be REVERSED and REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Irwin applied for DIB on April 2, 2003, alleging that she became disabled as of August 30, 2000, having previously filed in May 2002. (Tr. 115-17, 119-21, 160.) The Commissioner denied her application initially and upon reconsideration. (Tr. 43-47, 85-93.) On June 7, 2005, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Irwin, who was represented by counsel, Irwin's friend, and a vocational expert ("VE") testified. (Tr. 646.) On May 16, 2006, the ALJ rendered an unfavorable decision to Irwin. (Tr. 56-66.) Irwin submitted a request for review to the Appeals Council, which remanded the case for another hearing before the ALJ. (Tr. 48-51.) The ALJ conducted the second hearing on December 19,

---

[1]All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

2006, with testimony from Irwin, who was represented by the same counsel, and a VE.  (Tr. 683-92.)  The ALJ issued an unfavorable decision on February 22, 2007 (Tr. 16-31), and the Appeals Council denied Irwin's subsequent request for review (Tr. 6-8), making the ALJ's second decision the final decision of the Commissioner.

Irwin filed a complaint with this Court on July 27, 2007, seeking relief from the Commissioner's final decision.  (Docket # 1.)  She argues that the ALJ improperly evaluated the opinions of her treating psychiatrist, Dr. Mahender Surakanti, and her treating neurosurgeon, Dr. Jeffrey Kachmann.  (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 20, 23.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

Irwin was forty-six years old at the time of the ALJ's second decision.  (Tr. 115.)  She had a general equivalency degree and three years of college (Tr. 130, 649), and past work experience as a file clerk, waitress, sales clerk, machine operator, production worker, certified nursing assistant, and bartender.  (Tr. 125, 137-42, 161, 191, 199.)  In her most recent Disability Report, Irwin alleged depression, asthma, acid reflux disease, hip pain, headaches, and a thyroid condition (Tr. 160), and then included in her Opening Brief major depressive disorder, post traumatic stress disorder (PTSD), generalized anxiety disorder, cervical and lumbar osteoarthritis, and post cervical-decompression and fusion at C4-C6 (Opening Br. 2).

---

[2] The administrative record in this case is voluminous (692 pages), and the parties' disputes involve only small portions of it, that is, the ALJ's evaluation of the opinions of two of Irwin's treating physicians.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.  For example, this opinion omits details of Irwin's alleged impairments of asthma and migraines, which are not at issue in this appeal.

*B. Summary of Relevant Medical Evidence*

**1.      Mental Impairments**

From October 19, 2001, through January 29, 2002, Irwin saw Dr. Lana Patch, her family doctor, approximately six times for depression, which had recently worsened since her brother's suicide, and for problems sleeping. (Tr. 213-19.)  The doctor prescribed various medications to treat Irwin's complaints. (Tr. 213-19.)  Irwin reported numerous problems including anxiety, social withdrawal, nightmares, and on one occasion suicidal ideation, prompting Dr. Patch to recommend immediate crisis intervention counseling. (*See, e.g.,* Tr. 213, 217, 219.)  On a few visits, however, Irwin reported some improvement. (Tr. 213, 217.)

On February and April 2002, Irwin met with a social worker from the Bowen Center, Christine Motherwell. (Tr. 203, 206-09.)  Ms. Motherwell's diagnostic impression was major depressive, recurrent; generalized anxiety disorder; and bereavement, and she assessed her Global Assessment of Functioning score at sixty.[3] (Tr. 208.)

On September 10, 2002, Irwin saw Dr. David H. Gover for a consultative psychological exam at the state agency's request. (Tr. 224-27.)  Dr. Gover observed that she appeared mildly obsessive compulsive. (Tr. 224.)  He opined that Irwin was capable of performing simple, repetitive tasks continuously for a two-hour period, but her concentration was weak. (Tr. 227.)  His diagnosis was adjustment disorder with depression and anxiety, secondary to brother's suicide; mild obsessive-compulsive disorder; and that her current GAF and her highest GAF

---

[3]The Global Assessment of Functioning Scale is used by physicians to report the individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 32-34 (4th ed. Text Revision 2000) (hereinafter "DSM-IV-TR").  A GAF score of sixty indicates "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . ." *Id.*

during the past year were both seventy.[4]  (Tr. 227.)

In October 2002, state agency psychologist J. Gange, Ph.D., reviewed the record and concluded that Irwin's mental impairments were not severe.  (Tr. 235-48.)

Irwin returned to the Bowen Center in February 2003, after approximately a year's absence, for evaluation of the same problems.  (Tr. 304-07.)  Irwin explained that she had not returned to therapy due to transportation issues and fear of what she might find out.  (Tr. 305.)  She reported that her depression had worsened and that she has experienced suicidal thoughts.  (Tr. 304.)  Ms. Motherwell's diagnosis was major depression, recurrent; generalized anxiety disorder; bereavement; and underactive thyroid; and assessed her GAF score at fifty.[5]  (Tr. 306.)

On February 17, 2003, Irwin visited another doctor, Dr. Grinfield, for problems including depression and difficulties sleeping.  (Tr. 270-71.)  Dr. Grinfield found her depression "very concerning" and decided to arrange for an urgent evaluation at the Bowen Center.  (Tr. 271.)

On May 2, 2003, Dr. Patch wrote a letter indicating that Irwin's depression was "fully treatable and should not create a disability."  (Tr. 266.)

On May 28, 2003, Irwin saw George W. Merkle, M.D., P.C., for an evaluation in support of her disability benefits.  (Tr. 292.)  Dr. Merkle stated that Irwin has "a number of overwhelming psychological problems including chronic stress, generalized anxiety disorder and unipolar depression."  (Tr. 292.)  His impression of her psychological disorders was generalized anxiety disorder; stress disorder; and unipolar depression, major.  (Tr. 294.)  He concluded that

---

[4]A GAF score of seventy indicates "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, [and] has some meaningful interpersonal relationships."  DSM-IV-TR 34.

[5]A GAF score of fifty indicates "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR 34.

Irwin was "unable to engage in any gainful activity[,]" and that she has "a marked limitation of functional capacity due to chronic underlying neuropsychiatric disease with multiple somatic complaints and genuine illnesses which complicate the long-term management in a patient with no resources or insurance."  (Tr. 294.)  He further opined, "At this time vocational rehabilitation seems inappropriate, and it is expected that the patient's impairments will last for [at] least two years or until she can get into appropriate long-term counseling and care."  (Tr. 294.)

On June 25, 2003, Irwin underwent a mental status examination with Dr. Henry G. Martin at the agency's request.  (Tr. 318-21.)  She explained that she had been in counseling at the Bowen Center until May 2003 when she lost her Medicaid.  (Tr. 318.)  She reported not wanting to get out of bed, being easily upset, frequent thoughts of suicide, panic attacks in public, and having not driven for two months.  (Tr. 319.)  Dr. Martin found Irwin depressed and tearful.  (Tr. 319.)  Dr. Martin's diagnosis was Dysthymic Disorder and PTSD with a current GAF score of sixty-five.[6]  (Tr. 321.)

On November 7, 2003, the state agency doctors again opined that Irwin's mental impairments were not severe.  (Tr. 372.)

Beginning in January 2004 through mid-2006, Irwin regularly visited Dr. Mahender Surakanti, a psychiatrist at the Bowen Center who recorded her fluctuating symptoms and managed her medications.  (Tr. 407-17, 522-45.)  January 2004 through September 2004, Irwin's target symptoms were often unstable and her sleep inadequate, and Dr. Surakanti adjusted her prescriptions.  (Tr. 411-17.)  October 2004 through February 2005, Irwin's target symptoms

---

[6]A GAF score of sixty-five indicates "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, [and] has some meaningful interpersonal relationships."  DSM-IV-TR 34.

were more often stable, although her sleep was at times inadequate.  (Tr. 407-10.)  By March and

April 2005, however, Dr. Surakanti recorded that Irwin's target symptoms returned to instability

and her sleep remained inadequate.  (Tr. 541, 545.)

In April 2005, Dr. Surakanti and Susan Brumm, a counselor at Park Center, jointly

completed a Mental Impairment Questionnaire and a Medical Source Statement of Ability to Do

Work-Related Activities (Mental).  (Tr. 386-90.)  They reported Irwin's diagnoses of major

depressive disorder, severe with psychotic features; PTSD; and generalized anxiety disorder, and

assessed both her current GAF and highest for the past year at 58.[7]  (Tr. 386.)  The prognosis

was chronic.  (Tr. 387.)  They identified numerous signs and symptoms of her disorders,

including sleep disturbance, mood disturbance, delusions or hallucinations, recurrent panic

attacks, and suicidal ideation.  (Tr. 386.)  They explained that Irwin receives medication

management services and weekly group or individual treatments, and that she has made

improvements.  (Tr. 387.)  They indicated that Irwin's psychiatric condition exacerbates her

physical symptoms.  (Tr. 388.)  They also predicted that Irwin would miss on average more than

four days of work per month, and that if she returned to full-time work, she would be

overwhelmed.  (Tr. 388.)

On the Medical Source Statement, Dr. Surakanti and Ms. Brumm rated as poor (meaning

"[n]o useful abilty to function") Irwin's abilities to understand, remember, and carry out detailed

instructions; perform activities within a schedule, maintain regular attendance, and be punctual;

make simple work-related decisions; complete a normal workday or workweek; and perform at a

consistent pace.  (Tr. 389.)  Her other abilities were ranked as fair or good.  (Tr. 389.)  They

_____

[7]A GAF score of fifty-eight indicates "[m]oderate symptoms . . . or moderate difficulty in social,
occupational, or school functioning . . . ."  DSM-IV-TR 34.

6

based these findings on her attendance at counseling, remarking that she was absent frequently due to illness, and that during sessions they had to simplify and repeat instructions.  (Tr. 389.)

June through November 2005, Dr. Surakanti recorded instances when Irwin was "more depressed[,]" "doing not good[,]" and "not doing well[,]" but the medications were effective. (Tr. 530-31, 535-36, 540.)

Ms. Brumm performed an annual assessment on November 28, 2005.  (Tr. 527-29.) Irwin reported "moodiness, nightmares, and some problems with seeing her brother" who committed suicide.  (Tr. 527.)  Ms. Brumm's diagnostic impression was major depressive disorder, recurrent, severe, with psychotic features; generalized anxiety disorder; and PTSD, and she listed Irwin's various symptoms substantiating these diagnoses.  (Tr. 528.)  She recommended individual and group therapy.  (Tr. 529.)

From December 2005 through June 2006, Dr. Surakanti reported that Irwin's medications were effective, remarking at times that she was doing better or fair, and in other instances that her sleep was poor or that she was depressed.  (Tr. 522-26.)

On July 31, 2006, Irwin began treatment at Neuropsychiatric Associates, and a nurse practitioner, Bonnie Pearson, performed a psychiatric evaluation.  (Tr. 640-43.)  Irwin reported mood swings, hearing and seeing her deceased brother, and poor and interrupted sleep.  (Tr. 640.) Ms. Pearson rated her GAF score at forty-five.[8]  (Tr. 643.)  In August, Irwin again visited Ms. Pearson, who noted that Irwin was "not able to work" and again assessed her GAF score at forty-five.  (Tr. 638.)  At a second August visit, her GAF was fifty.[9]  (Tr. 636.)   She returned

_____

[8]A GAF score of forty-five indicates "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning."  DSM-IV-TR 34.

[9]*See supra* note 5 and accompanying text.

7

twice in September and once in October for the same problems and was assigned GAF scores of
forty-five, fifty, and fifty-five.[10]  (Tr. 631, 633.)  The notes of the last visit indicate that she
stopped taking her medicines due to illness.  (Tr. 631.)  From August through October 2006,
Irwin also attended four psychotherapy sessions at Neuropsychiatric Associates with a social
worker, who assigned her GAF scores at forty-five.[11]  (Tr. 631-35.)

### 2.      Physical Impairments Pertaining to the Lumbar and Cervical Spine

In May and June 2003, Irwin complained of back pain to both Dr. Grinfield and Dr.
Merkle.  (Tr. 294, 352, 354.)  Dr. Merkle's impression was chronic low back pain.  (Tr. 294.)

In July 2003, state agency physician J. Sands, M.D., performed a Physical Residual
Functional Capacity Assessment and determined that she could lift twenty pounds occasionally
and ten pounds frequently; stand or walk for about six hours in an eight hour workday; and sit
for about six hours in an eight hour workday.  (Tr. 364-71.)  He also found that Irwin could
perform occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and that
she needed to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, etc.
(Tr. 366, 368.)  This determination was affirmed in November 2003.  (Tr. 371.)

In August 2003, neurologist Jeffrey K. Kachmann, M.D., performed a neurosurgical
consultation on Irwin.  (Tr. 341-42.)  Dr. Kachmann noted that Irwin had five out of five motor
strength throughout, but had a paucity to it secondary to effort on the right.  (Tr. 342.)  He
further recorded that her straight leg raise was positive on the right with low back pain elicited.
(Tr. 342.)  He also reviewed the results of an April MRI which indicated lumbar bulging disc but

---

[10]*See supra* notes 5, 8 and accompanying text. A GAF score of fifty-five indicates "[m]oderate symptoms . .
. or moderate difficulty in social, occupational, or school functioning . . . ."  DSM-IV-TR 34.

[11]*See supra* note 8 and accompanying text.

no evidence of nerve compression or concern.  (Tr. 342.)  He did not recommend surgery.  (Tr. 342.)

A September 2003 MRI of her lumbar spine revealed a subtle bulge at L5-S1 and a slight signal loss since the April 2003 MRI, but no focal bulge or neural impingement.  (Tr. 337, 355.) On September 18, 2003, Irwin saw J. G. Glazier, M.D., for a second epidural block.  (Tr. 344.) He noted that Irwin had previously undergone another epidural block, which had produced only minimal relief.  (Tr. 344.)

Irwin visited Dr. Luisa Sumabat, her family doctor, several times from April through June 2004 for numerous complaints including back pain, numbness in right thigh and foot, and weakness in right leg.  (Tr. 400-05.)  A cervical spine x-ray conducted in April revealed mild degenerative changes at C5-6 and C6-C7 (Tr. 406), and a June MRI of her lumbar spine showed mild disk disease at L5-S1 and facet osteoarthritis at L4-5 and L5-S1 levels (Tr. 399).

Irwin returned to Dr. Kachmann in July 2004 for back pain radiating down her right leg. (Tr. 446.)  The exam was normal, save reduced reflexes in her ankle.  (Tr. 446.)  He referred Irwin to Dr. David Lutz, a physiatrist, and recommended against surgery.  (Tr. 446.)  She saw Dr. Lutz in August, who suggested conservative treatment such as physical therapy.  (Tr. 440-41.)

On October 13, 2004, a neck x-ray revealed cervical spondylosis, as well as osteophytic ridging, some loss of disk height at C5-6 level, and narrowing of the right neural foramen at C5-6.  (Tr. 397.)  A November MRI of the cervical spine revealed C3-4 and C4-5 posterior osteophytic bar and annular disk bulges, and C5-6 small central and right paracentral disk protrusion, but not true stenosis.  (Tr. 395.)

Irwin returned to Dr. Lutz in November 2004, reporting neck pain and left upper extremity paresthesias.  (Tr. 427.)  He noted that she had not followed through with his recommendations for physical therapy and a steroid taper, and suggested an empiric trial of Neurontin and physical therapy.  (Tr. 427-28.)  His impression was mild degenerative disk disease at L5-S1 and facet arthritis at L4-5 and L5-S1 levels.  (Tr. 428.)

A discharge summary from physical therapy, dated December 14, 2004, indicated that Irwin achieved a decrease in pain and in paresthesia radiating into her upper left extremity, and had full mobility functionally with tightness.  (Tr. 418.)

In March 2005, Irwin visited Dr. Lutz complaining of back pain because of a fall, and she was using a cane.  (Tr. 509.)  She returned approximately a week later, and he noted that recent films were negative, her back symptoms improved, and she may be a candidate for non-operative spinal disk decompression treatments.  (Tr. 504-05.)

In April, Irwin visited the emergency room ("ER") for severe back pain.  (Tr. 493.)  The next month, she saw Dr. Sumabat for problems with her grip, decrease in strength, and numbness.  (Tr. 486.)  An MRI performed a week later showed new developments in her back and neck, including a focally accentuated disk protrusion in the right paramidline at C4-5, and a new small right foraminal disk protrusion at C5-6.  (Tr. 483-84.)

On October 26, 2005, Dr. Kachmann treated Irwin again for neck and back pain radiating down her left arm and legs.  (Tr. 500-01.)  On the neurological exam, her sensation to pinprick was reduced and reflexes were absent throughout.  (Tr. 501.)  Dr. Kachmann opined that Irwin was "at the end of her line with regard to conservative management for her neck problems" and considered surgery.  (Tr. 501.)  The neck surgery was ultimately performed on November 8,

2005.  (Tr. 515-17.)  At a follow-up appointment in December, Irwin saw Dr. Kachmann's

physician assistant, Heather Zeigler, P.A.-C, who noted that the wound had "nicely healed" and

Irwin's left arm symptoms had improved, but she still had neck stiffness and muscle weakness.

(Tr. 607-08.)  She discussed lifting restrictions and activities, and indicated that Dr. Kachmann

viewed x-rays revealing adequate fusion.  (Tr. 607.)

 Irwin returned to Dr. Kachmann in January 2006 for lower back pain.  (Tr. 520.)  He

reported five out of five motor strength with give away weakness, some numbness, positive

straight-leg raising, and an antalgic gait.  (Tr. 520.)  He noted that a lower back MRI performed

that day revealed a right L5-S1 lateral disk protrusion abutting but not displacing the right L5

nerve root, and some degenerative changes.  (Tr. 520, 598.)  Dr. Kachmann recommended

conservative treatment, noting that "[c]ertainly, along with her other medical issues, including

psychological issues, [Irwin] is not a good candidate for return to work status."  (Tr. 521.)

In April and May 2006, Irwin complained to Dr. Sumabat of severe back pain and neck

pain.  (Tr. 618.)

In June 2006, Irwin visited Dr. Kachmann for exacerbation of her back pain following a

fall.  (Tr. 602.)  Dr. Kachmann noted five out of five motor strength, subjectively reduced

sensation of her legs, negative straight-leg raising with low back pain elicited, and reduced

reflexes.  (Tr. 602-03.)  He recommended an MRI of the lower back, which came back negative,

and he therefore decided to continue conservative management.  (Tr. 601, 603.)  An x-ray

performed the following August was unremarkable.  (Tr. 551.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C.

§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[12]  *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

The ALJ rendered his decision on February 22, 2007.  (Tr. 19-31.)  At step one of the five step analysis, he found that Irwin had not engaged in any substantial gainful activity since her alleged onset date.  (Tr. 22.)  At step two, he found that Irwin had severe impairments of adjustment disorder with depression, PTSD, asthma, migraine headaches, and degenerative disease in her lumbar and cervical spine.  (Tr. 22.)  At step three, the ALJ determined that her impairments did not meet or equal a listing.  (Tr. 23.)  Before proceeding to step four, the ALJ

---

[12] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

found that Irwin has the RFC "to lift/carry up to 20 pounds occasionally and 10 pounds frequently; the claimant should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation, and being around employees or . . . the public throughout the workday, but with only occasional (up to one third of a workday) conversations and interpersonal interaction." (Tr. 24.)  The ALJ also concluded that although Irwin's "medically determinable impairments could have been reasonably expected to produce the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (Tr. 28.)

Based on this RFC and the VE's testimony, the ALJ found at step four that Irwin is able to perform her past relevant work as a file clerk. (Tr. 30.)  Alternatively, he further determined at step five that even if she could not perform her past relevant work, a significant number of jobs exist in the national economy for someone with her age, education, work experience, and RFC, such as office helper, fast food worker, sales attendant, order clerk, tape printer, and change asset clerk. (Tr. 30-31.)  Therefore, Irwin's claims for DIB were denied. (Tr. 31.)

### C.  Evaluation of the Treating Physician's Opinion

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir.

2002). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id*.; *Diaz*, 55 F.3d at 306 n.2; *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 818 (N.D. Ill. 2006). Nonetheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8. "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) . . . ." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.

### 1. The ALJ Improperly Evaluated the Opinion of Dr. Surakanti, Irwin's Treating Psychiatrist

Irwin contends that the ALJ improperly evaluated Dr. Surakanti's opinion that Irwin would miss more than four days a months due to her mental impairments. (Opening Br. 20.) In

15

so doing, Irwin essentially argues that the ALJ engaged in selective review of the evidence and improperly substituted his own opinion for the doctor's.  (Opening Br. 21-23.)  With respect to Dr. Surakanti's opinion, the ALJ stated the following:

> Dr. Mahender Surakanti and Ms. Susan Brumm stated in April of 2005 that the claimant has major depressive disorder with psychotic features, post traumatic stress disorder, and generalized anxiety disorder with a [GAF] of 58.  They stated that the claimant would be absent more than four days a month and that she was frequently absent because of illness.  They said that she has poor ability to understand, remember, and carry out detailed instructions and to complete a normal workday or workweek.  Dr. Surakanti and Ms. Brumm also found that it was important to simplify and repeat instructions.  The medical records received from Dr. Surakanti and Ms. Brumm during April 11, 2005 through June 6, 2005 revealed that although the claimant's ability to sleep was poor at times the medications were effective in controlling her symptoms.

(Tr. 28 (citations omitted).)

The ALJ failed to adequately articulate his rejection of Dr. Surakanti's opinion.  The ALJ seems to summarily discount it based *solely* on the fact that there was a period of time when Dr. Surakanti reported that her medications were effective in controlling her symptoms.[13]  This perfunctory analysis fails to build an accurate and logical bridge between the evidence and his conclusion. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) (collecting cases that state an ALJ is required to build an accurate and logical bridge between the evidence

---

[13]While the ALJ pins the period of April 2005 through June 2005 when the doctor recorded Irwin's medication as being effective, it appears that these dates are incorrect.  In fact, it is not until June 2005 when the doctor began checking a box on the evaluation form verifying that the medications were effective (*compare* Tr. 540 *with* Tr. 541), and Dr. Surakanti checked this box through June *2006*.  This box, however, was not on the forms prior to June 2005 (*see, e.g.,* Tr. 541), and so the doctor did not explicitly report on the effectiveness of the medications in his prior reports.  Thus, it is unclear whether Dr. Surakanti began reporting that the medications were effective in June 2005 merely because of the different kind of form he was filling out or whether it was due to a change in Irwin's progress.

Regardless of the time frame in which Irwin's medications were reported to be effective, however, the same analyses still applies: the ALJ did not take into account that she continued to have symptoms fluctuating in severity despite the effectiveness of her medicine, the ALJ "played doctor" in finding that because her medicines are effective she would not miss work to the extent Dr. Surakanti predicted, and the ALJ did not properly analyze Dr. Surakanti's opinion pursuant to the factors in 20 C.F.R. § 404.1527.

and his conclusion so that a court may afford the claimant a meaningful review).

To elaborate, the ALJ does not explain how Dr. Surakanti's record that her medications were effective necessarily undermines his opinion that she would miss four or more days of work, when the Bowen Center's records reveal that even though the medications may have been effective, Irwin continued to have significant problems. For example, Irwin's symptoms fluctuated in severity over the course of their treatment relationship: her target symptoms were often unstable, her sleep was frequently inadequate, and at one time she was suicidal. (Tr. 411-17, 541, 545.) In fact, in April 2005, the same month as his mental impairment questionnaire and medical source statement, Dr. Surakanti recorded that Irwin's target symptoms were unstable and her sleep inadequate, and he adjusted her medications. (Tr. 541.) Additionally, Irwin points to her annual evaluation of that year, which Ms. Brumm conducted in November 2005 and indicates that Irwin was having problems including sleeping, depressed mood, anxiety, and nightmares and hallucinations, and that the diagnostic impression was major depressive disorder, recurrent, severe, with psychotic features; generalized anxiety disorder; and PTSD. (Tr. 527-29.) Yet, the ALJ nevertheless discounted Dr. Surakanti's opinion, with the only explanation being that he reported that her medications were effective.[14]

Furthermore, Dr. Surakanti stated in his report that if Irwin returned to work she would

---

[14]The Commissioner asserts that Ms. Brumm's "November 2005 assessment does not support Plaintiff's argument that the ALJ improperly weighed the April 2005 opinion" principally because the evaluation was completed six months after Dr. Surakanti and Ms. Brumm's April 2005 opinion, and Dr. Surakanti did not sign the November 2005 report. The Commissioner's arguments, however, miss the mark. The point is not that the ALJ should have given any particular weight to or specifically evaluated Ms. Brumm's annual assessment, but that overall, the Bowen Center's records over the course of her treatment, including Ms. Brumm's November 2005 report, show that Irwin had significant problems, just as Dr. Surakanti attested to in his questionnaire and medical source statement. Therefore, the ALJ's only stated reason for discounting Surakanti – that he indicated that the medications were effective – seems perfunctory and does not "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

become "overwhelmed" and her mental functioning would decrease.  (Tr. 388.)  As Irwin points

out, the ALJ apparently did not consider or address this evidence when discounting Dr.

Surakanti.  *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (opining

that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether

it was even considered); *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (emphasizing

that unless the ALJ sufficiently articulates his reasoning, the reviewing court cannot tell if the

ALJ rejected probative evidence or simply ignored it).

 Instead, as Irwin asserts, it appears that the ALJ succumbed to the temptation to "play

doctor" when he independently concluded that because her medications are effective she would

not miss four or more days of work each month.  *See, e.g., Blakes ex rel. Wolfe v. Barnhart*, 331

F.3d 565, 570 (7th Cir. 2003); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (emphasizing

that an ALJ must not make independent medical findings about whether certain activities are

inconsistent with a particular medical diagnosis); *Alexander v. Barnhart*, 287 F. Supp. 2d 944,

963-64 (E.D. Wis. 2003) (holding that it was improper for the ALJ to conclude that the claimant

did not display the necessary symptoms of fibromyalgia, as the ALJ was not an expert at

diagnosing such a condition).  Significantly, without any explanation or analysis, the ALJ

ignored or rejected Dr. Surakanti's view that returning to work would decrease her mental

functioning, and instead apparently supplanted his own view that because her medications are

currently effective her mental illness would not impact her ability to regularly attend work.  *See*

*Brennan-Kenyon v. Barnhart*, 252 F. Supp. 2d 681, 693 (N.D. Ill. 2003) ("[T]he ALJ erred by

impermissibly playing doctor when he ignored and failed to address relevant medical evidence.

In failing to address relevant evidence favorable to Plaintiff, the ALJ appears to have implicitly

relied on other evidence in the record which was unfavorable to Plaintiff." (citations omitted));
*Gillespie v. Barnhart*, No. 02 C 5172, 2003 WL 22232631, at *11 (N.D. Ill. September 25, 2003).

The Commissioner argues *post hoc* that Dr. Surakanti's opinion that Irwin's functioning would decrease if she returned to work would not, in any event, be entitled to any significant weight because that opinion appears to be based on subjective complaints.  (Resp. Br. 22.)  "The first problem with [the Commissioner's] argument is that the ALJ did not make it. '[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine [judicial] review to the reasons supplied by the ALJ.'"  *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005) (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)).

This argument would nevertheless fail even if the Court considered its merits.  It is true that the ALJ may discount a medical source opinion based upon the claimant's subjective report of symptoms, rather than medically acceptable clinical and laboratory diagnostic techniques.  *See* SSR 96-2p; *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (discounting a treating physician's opinion because it was based on the claimant's subjective complaints); *Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000).  Here, however, Dr. Surakanti relied upon more than self-reports; he *explicitly stated* that he reviewed the Mental Consultative Exam (Tr. 386), and he also based his assessments on objective observations and findings with respect to Irwin's attendance at counseling and her frequent absences due to illness (Tr. 383).  Therefore, the Commissioner's argument that Dr. Surakanti's opinion was based only on subjective complaints is flawed.  Furthermore, "[a] patient's report of complaints, or history, is an essential diagnostic tool[,]" *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997), and Irwin's problems are

psychiatric in nature, which are "not as readily amenable to substantiation by objective laboratory testing as a medical impairment . . . ," *Poulin v. Bowen*, 817 F.2d 865, 873-74 (C.A.D.C. 1987).[15]

Consequently, the ALJ's sole example of the purportedly inconsistent objective medical evidence with respect to Dr. Surakanti's opinion – that there was a period of time when the medication was effective – fails to build an accurate and logical bridge between the evidence and his conclusion.  *Blakes*, 331 F.3d at 569; *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." (citations omitted)).

Furthermore, the ALJ also erred when he failed to properly evaluate Dr. Surakanti's opinion for purposes of assigning it an appropriate weight.  When a treating physician's opinion is found to be inconsistent with or not well supported by the evidence in the record, and is thus not entitled to controlling weight, the opinion is still entitled to deference and must be weighed using the factors in 20 C.F.R. § 404.1527.  *See generally Books*, 91 F.3d at 979 (articulating that when conflicting medical evidence exists, the ALJ must consider the factors set forth in 20

---

[15]Furthermore, as Irwin points out, the ALJ did not discuss all of her GAF scores from Neuropsychiatric Associates, PC, which reflect serious symptoms or serious impairment in social, occupational, or school functioning. (Opening Br. 22.)  This argument is less persuasive than Irwin's other arguments, however, because "the ALJ need not evaluate in writing every piece of testimony and evidence submitted[,]" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), and, as the Commissioner asserts, they occurred a year after Dr. Surakanti's opinion and six months after Irwin's insured status expired.  There is some merit to Irwin's position, though, in light of the fact that the ALJ only discussed one of the serious GAF scores that Neuropsychiatric Associates assigned, even though they assigned her approximately *eight* GAF scores in that range, and they seem to be probative in corroborating Dr. Surakanti's reports of serious symptoms.  *See id.* (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . .") (internal quotation marks and citation omitted)); *Gillespie*, 2003 WL 22232631, at *11 (remanding where the ALJ listed some of the medical evidence, but "fail[ed] to articulate his basis for either crediting or rejecting specific diagnoses and assessments favorable to [p]laintiff").  Moreover, "the ALJ must consider evidence that post-dates the relevant period to the extent that it corroborates or supports the evidence from the relevant period."  *Blom*, 363 F.Supp.2d at 1059.

20

C.F.R. § 404.1527); *Rohan*, 98 F.3d at 971 (finding that an ALJ need not evaluate every piece of evidence in writing, but must sufficiently articulate the ALJ's assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced).  Indeed, in the portion of the opinion in which the ALJ discussed the weight he assigned the various doctors' opinions, the ALJ does not even mention Dr. Surakanti's opinion; he never discussed the length of Irwin's treatment relationship with Dr. Surakanti, the frequency of examination, the nature and extent of the treatment relationship, or Dr. Surakanti's area of practice.  *See* 20 C.F.R. § 404.1527(d).

In sum, the ALJ's rejection of Dr. Surakanti's opinion is inadequately articulated.  The Commissioner's decision will be remanded so that the ALJ may properly evaluate Dr. Surakanti's opinion, articulating his analysis of the evidence to build an accurate and logical bridge between the evidence of record and his conclusion.  *Blakes*, 331 F.3d at 569.

**2.      The ALJ Selectively Reviewed the Opinion of Dr. Kachmann, Irwin's Treating Neurosurgeon.**

Irwin also argues that "although the ALJ summarizes some of the records and reports of Dr. Kachmann, he did not even mention the opinion of Dr. Kachmann on her limitations." (Opening Br. 23.)  Irwin's argument is meritorious.

On January 16, 2006, in a letter addressed to Dr. Sumabat, Dr. Kachmann opined, "Certainly, along with her other medical issues, including psychological issues, [Irwin] is not a good candidate for return to work status.  She will likely need to pursue long-term disability. Coupled with her neck and back problems, I feel that this is reasonable."  (Tr. 521.)  The Commissioner argues that the ALJ did discuss some of Dr. Kachmann's findings, and that he was not required to discuss Dr. Kachmann's "conclusory" opinion because he "need not discuss

every piece of evidence presented to him;" only enough to "'build an accurate and logical bridge between the evidence and the result.'"  (Resp. Br. 11-12.)

Even though "the ALJ is not required to address every piece of evidence" *Clifford*, 227 F.3d at 872, he must nevertheless evaluate the record fairly without selectively reviewing the evidence.  *Stein v. Sullivan*  892 F.2d 43, 47 (7th Cir. 1989) ("The Secretary may not select only that evidence that favors his ultimate conclusion; rather, he must articulate at some minimum level his analysis of the evidence in cases in which considerable evidence is presented to counter the agency's position.  That is, the Council need not address each piece of evidence or all of the testimony separately, but the decision must be based on fair consideration of all of the evidence presented.") (internal quotation marks and citations omitted); *see also Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Dr. Kachmann's opinion that Irwin is "not a good candidate for return to work status" (Tr. 521) is significant favorable evidence that conflicts with the examining physician's findings and the ALJ's ultimate conclusion that Irwin can "perform light exertional work with environmental restrictions" (Tr. 29).  Because the ALJ "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position[,]" *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000), the ALJ has thus erred in failing to mention and evaluate this evidence.[16]

---

[16]The Commissioner further maintained that Dr. Kachmann's opinion "was not entitled to any special weight" because the issue of Irwin's disability is reserved only for the Commissioner; it was based in part on Irwin's psychological problems, for which Dr. Kachmann did not treat her; and "the ALJ cited other reliable evidence in the record that undermined Dr. Kachmann's opinion."  (Resp. Br. 12.)  However, "[r]egardless of the weight the ALJ ultimately gives the treating source opinion, []he must always 'give good reasons' for h[is] decision."  *Blom*, 363 F. Supp. 2d at 1059 (internal quotation marks and citations omitted)).  In this instance, the ALJ's opinion is devoid of any such reasoning with respect to Dr. Kachmann's opinion about Irwin's capabilities, and thus the Commissioner's arguments fail on this point.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Irwin and against the Commissioner.

SO ORDERED.

Enter for this 21st day of May, 2008.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge
